UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA       CIVIL ACTION NO. 07-50033-01-06

versus       JUDGE STAGG

LORA LEA TOMLINSON       MAGISTRATE JUDGE HORNSBY
SELENA WILLIS NICHOLS
JOEL DALLAS HAMMOND
CASSANDRA WESSON COLLINS
BRAD ALAN BLANTON
GREGORY BRIAN HEARN

## REPORT AND RECOMMENDATION

### Introduction

Before the court are five Motions to Suppress:  Doc. 30 (Collins), Doc. 32 (Hearn), Doc. 33 (Tomlinson), Doc. 36 (Hammond), and Doc. 42 (Nichols).[1]    A hearing on the motions was held on July 11, 16 and 17, 2007.  At the conclusion of the hearing,  Defendants requested and received permission to file supplemental memoranda.  See Docs. 71-76.  The Government filed a supplemental response.  Doc. 77.  A transcript of the hearing was prepared and filed into the record.[2]  After a careful review of the motions, original

---

[1]Defendant Brad Blanton also filed a Motion to Suppress (Doc. 35), but he entered a guilty plea on June 28, 2007 and did not participate in the evidentiary hearings. Accordingly, it is recommended that Blanton's **Motion to Suppress (Doc. 35) be denied as moot**.

[2]The transcript consists of three volumes and totals 532 pages.

memoranda, supplemental memoranda, and the evidence, it is recommended that the Motions to Suppress be denied.

**Facts**

The evidence at the evidentiary hearing establishes the following facts. On March 9, 2007, Shreveport police came into contact with a confidential informant (CI)[3] who was found to have methamphetamine ice in her possession. Vol. I, p. 22. During the course of the interview of the CI, she provided information regarding drug trafficking activities of defendants Brad Blanton and Gregory Hearn. It was determined that Hearn was the same person that Deputy Shawn McCullough had been investigating earlier that week for alleged drug trafficking.[4]

The officers obtained the CI's consent for her to participate in an undercover buy from Blanton and Hearn, both of whom, according to the CI, were in Room 1711 of the Eldorado Casino. Vol. I, p. 10. Prior to the purchase and while inside the parking garage of Eldorado, the officers checked the CI's purse for contraband and fitted her with an audio transmitter.[5]

---

[3]This CI was well known to case agent Trae Herren, a Webster Parish Sheriff's Office Deputy assigned to the DEA Task Force. Herren has known the CI for approximately 25 years, and she had given Herren reliable information in the past that resulted in criminal convictions.

[4]McCullough had learned from another confidential informant (referred to in the hearing as CI 2) that someone identified as Gregory Hearn was at motels throughout the city and was in possession of a large amount of methamphetamine ice. Vol. I, pp. 18-19.

[5]The officers did not search the CI's person at this time, because no female officers were present and the officers understood that she had been searched earlier that day during her interview at the Shreveport Police Department. Vol. I, p. 25.

The CI was given $700 in funds to make the purchase. Other officers obtained access to Room 1710, which is across the hall from Room 1711, to set up visual surveillance (through the peephole) and to monitor the transaction from the audio transmitter. Vol. I, pp. 26-27.

While still in the parking garage, the CI attempted to telephone Hearn and Blanton to arrange the purchase. During those efforts, the CI saw Blanton enter the parking garage, at which point she identified Blanton to the officers. Vol. I, pp. 12-13. Shortly thereafter, the CI reached Hearn by telephone. Hearn told her to come to Room 1711.

The CI entered Room 1711 at approximately 1:30 p.m. Vol. I, pp. 24-25. She was in the room for approximately 15 to 20 minutes.[6] Id., p. 27. When she left the room and exited the elevator, she was met by the officers. She handed the officers a clear plastic baggie containing approximately 12 grams of methamphetamine ice that she purchased inside Room 1711. Id., pp. 13-14. The CI told the officers that she saw about a pound of methamphetamine ice in a Wal-Mart shopping bag inside Room 1711. Id., p. 15. Deputy McCullough then went to his office and began typing a search warrant for Room 1711. Id., p. 28.

The officers continued their peephole surveillance on Room 1711 while waiting for a search warrant. They saw Hearn exit Room 1711 and start walking down the hallway. Vol.

---

[6]As mentioned, two agents were across the hall in Room 1710 and monitored the controlled buy through the electronic device that was placed on the CI. Vol. I, pp. 92-93. However, the transaction was not recorded.

I, p. 93.  Three officers followed Hearn down the hall to a vending machine.  The officers seized Hearn, handcuffed him and advised him of his rights.  Vol. I, p. 94.

Sargent Carl Townley of the Caddo-Shreveport narcotics unit had earlier obtained a key to Room 1711 from the hotel's management.  Townley walked to Room 1711 with two other officers to attempt to secure the room.  However, Townley's key did not work, so he went back to Hearn and asked Hearn to give him his (Hearn's) key.  Hearn told Townley that his key was in his wallet.  Townley then retrieved the key from Hearn's wallet.  Vol. I, p. 95.

The officers entered and secured Room 1711.[7]  Brad Blanton was in Room 1711 and he was also secured and arrested.  Vol. I, p. 95.   Blanton was advised of his rights.  Vol. I, p. 96.  Hearn told the officers that he obtained his methamphetamine from Blanton.  Vol. III, p. 386.  Blanton, in turn, advised the officers that he received his methamphetamine from someone named "Lora" in Room 930 at DiamondJack's Casino.  Id.

Agent Trae Herren and Agent Michelle Sears presented to the undersigned, at approximately 7:10 p.m., an application for a warrant for Room 1711. The application for the warrant established probable cause for the search of Room 1711 based on the information provided by the CI concerning the large quantity of methamphetamine ice she saw in Room

---

[7]The evidence established that the officers wanted to secure the room so that evidence would not be destroyed.  Vol. I, p. 93.  The officers were also concerned about their safety because, in their experience, people who are involved in drug dealing often have guns on or with them.  Vol. III, p. 506; Vol. I, pp. 84, 130.

1711 and the electronically monitored purchase of methamphetamine ice by the CI from the occupants of Room 1711.

Once the warrant was signed, a full search of Room 1711 was conducted. The officers seized approximately 400 grams of methamphetamine and approximately $10,000 in cash. Vol. III, pp. 385-386.

The officers then contacted the management at DiamondJack's Casino and confirmed that a Lora Tomlinson had occupied Room 930, but she had moved earlier that day into Room 940 because of an air conditioning or other problem with Room 930. Vol. I, p. 191. Tomlinson had also been registered in Rooms 843 and 919 earlier that week. Vol. I, p. 234.

The management at DiamondJack's Casino provided the officers with Ms. Tomlinson's full name, a few pictures of Ms. Tomlinson and some pictures of people with whom she had associated during that week. Vol. I, p. 191. Casino management also gave the officers a key to Room 941, which is located next door to Room 940, the room then occupied by Tomlinson. Id. at 192. Rooms 940 and 941 had adjoining doors, so that if the doors inside each room were opened, the occupants could move between Rooms 940 and 941 without using the hallway doors. Id. at 192.

At approximately 7:50 p.m., Defendant Joel Hammond was observed entering Room 940. Vol. I, pp. 194-195. After a few minutes, Hammond left Room 940 and was not seen again until approximately 11:20 p.m. that evening, when he met Defendant Selena Nichols in the lobby of the casino. Vol. I, p. 200.

At approximately 8:30 p.m., the officers in Room 941 overheard three females engaging in general conversation in Room 940. Vol. I, p. 124. The officers had opened their portion of the adjoining doors between Rooms 940 and 941 to enhance their ability to listen to the conversation. One female voice was heard to say: "Hey, now you are a real dope dealer." Vol. I, pp. 123-124, 196. The officers did not employ any listening devices; they just listened through (and under) the closed adjoining door using the "naked ear." Vol. I, p. 132.

A female later identified as Defendant Cassandra Collins was observed leaving Room 940 at about 8:42 p.m. Approximately four officers followed Collins to the elevator, down to the first floor and near the entrance to the casino area. Vol. I, p. 125. According to Task Force Agent Hank Haynes: "We were behind her following her. Of course she was suspicious of four guys following her. She was very close to her purse, kept it to her person, kept her elbow over her purse, made sure her flap was down. She was acting in a very nervous manner." Vol. I, p. 196.

Agent Haynes and Agent Gary Hill approached Collins, identified themselves and advised her that they were doing a methamphetamine investigation. Haynes advised Collins of her rights and asked her how much methamphetamine she had on her person. Id. at 197. In response, Collins put her purse down on a nearby bench and advised the officers that the methamphetamine was in her purse. Agent Haynes opened the purse and in the very top of the purse were two envelopes containing a large amount of methamphetamine. Agent

Haynes stated that it appeared to be approximately two ounces, but Collins corrected him stating that six ounces were in one envelope and one ounce was in the other.  Vol. I, p. 197.

Collins was then transported to the Louisiana State Police's office inside the casino. Vol. I, p. 198.  Collins was asked whether she had any drugs in her vehicle.  She responded that she had a small amount of marijuana, a marijuana pipe and a methamphetamine pipe in her vehicle.  She gave verbal consent to search her vehicle and provided the keys to Agent Haynes.  Vol. I, pp. 198-199.  A search of the car revealed exactly what Collins said would be in there, plus a set of digital scales.  Vol. I, p. 199.

Agents continued to listen to the conversations in Room 940.  Vol. I, p. 126.  DEA Agent Will Green heard two distinct female voices in Room 940.  He also heard a Nextel-type cell phone with a "walkie talkie" function.  Agent Green heard a male's voice come over that cell phone and stated that the caller was in Terrell, Texas and was headed to Shreveport. Vol. I, p. 127.  Agent Green heard a butane lighter ignite, which, in his experience, was an indication that a pipe was being used to smoke methamphetamine.  Vol. I, p. 127.

At approximately 10:58 p.m., an application for a search warrant for Room 940 was presented to the undersigned.  The application established probable cause for the search of Room 940 based on the information obtained from the earlier search of Room 1711; Blanton's statement to the officers that he purchased his methamphetamine from Lora Tomlinson at Room 930 of DiamondJack's Casino; Tomlinson's relocation to Room 940; the agents' surveillance of the conversations in Room 940; and the agents' confrontation of

Collins as she left Room 940 and their discovery of approximately seven ounces of methamphetamine in her purse.

At approximately 11:13 p.m., Lora Tomlinson and Selena Nichols were seen leaving Room 940.  Vol. I, p. 199.  Tomlinson entered the casino gaming area, where she was later arrested by the agents.  Nichols was followed into the lobby.  She was seen sitting on a bench and appeared to be sending text messages.  Hammond (who was last seen leaving Room 940 earlier that evening) arrived in the lobby at approximately 11:20 p.m. and met with Nichols. Vol. I, p. 200.

Followed by numerous undercover agents, Nichols and Hammond walked together to the elevator and went to the ninth floor.  Vol. I, p. 200.  Upon exiting the elevator, Nichols and Hammond did not turn towards Room 940 as the officers anticipated.  Instead, they turned in the opposite direction and began walking toward Room 923, a room that was not on the officers' "radar" prior to that time.  Nichols and Hammond were arrested as they tried to enter Room 923.

During the commotion of the arrests, the agents heard a female's voice inside Room 923.  A female later identified as Jana Hammond, Hammond's wife, partially opened the door.  Agent Haynes asked for permission to enter the room.  Mrs. Hammond said she did not have any clothes on.  There is a conflict in the testimony about what happened next (whether Mrs. Hammond granted permission for the agents to enter the room and the extent to which Mrs. Hammond was dressed).  Compare Vol. I , pp. 48, 50 (Sargent Townley) to

Vol. I, pp. 201, 223-225, 242 (Agent Haynes). Despite that conflict, the evidence shows that Mrs. Hammond attempted to close the door. However, the agents pushed the door open and entered the room.

In plain view in Room 923, the agents saw a methamphetamine pipe on a table in the room.  Vol. I, p. 201.  The agents then advised Mr. Hammond, Mrs. Hammond and Ms. Nichols of their rights.  Mr. Hammond took responsibility for all of the drugs in the room. Vol. I, p. 202.  (Mrs. Hammond was not arrested.)

At about the same time the agents arrested Nichols and Hammond outside of Room 923, other agents were executing the search warrant for Room 940.  There were no occupants in Room 940 at that time.  Vol. I, p. 128.

Selena Nichols (who was arrested outside Room 923) and Lora Tomlinson (who was arrested in the casino gaming area) were escorted to Rooms 940 and 941 where they were read their rights.  Vol. I, p. 129.  Initially, Nichols was placed in Room 941 and Tomlinson was placed in Room 940.  Vol. III, p. 390.  Both adjoining doors separating Rooms 940 and 941 were fully opened, and  Nichols and Tomlinson talked back and forth to one another through the open doorway.  Vol. III, p. 390.  They asked the agents if they could be together, and eventually the agents placed them together in Room 940.  Both women also asked for an attorney, so they were not questioned.  Later, while the agents were collecting evidence from Room 940, Tomlinson and Nichols asked the agents how much jail time they were facing.  The agents told them that, because it was a federal investigation, they were looking

at approximately 10 years to life.  Vol. III, p. 391.  At that point, Tomlinson and Nichols decided they wanted to cooperate.  Both were again read their <u>Miranda</u> rights and both made incriminating statements.

**Law and Analysis**

### Hearn's Motion to Suppress (Doc. 32)

Gregory Hearn (who was arrested outside of Eldorado Room 1711 as he approached the vending machines) argues that the court should suppress all evidence seized on his person and found in Room 1711.  According to Hearn, the "pivotal issue raised in [his] motion to suppress is did the officers have legal justification to enter Room 1711 of the Eldorado Casino Hotel without a search warrant."  Hearn's Supplemental Memorandum at p. 6.  To resolve this issue, the court must determine whether there were exigent circumstances that made it necessary (after arresting Hearn near the vending machines) for the officers to enter and secure Room 1711 before a search warrant for Room 1711 could be obtained.

In determining whether exigent circumstances exist, courts consider:

(1)    The degree of urgency involved and amount of time necessary to obtain a warrant;

(2)    The reasonable belief that contraband is about to be removed;

(3)    The possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;

(4)    Information indicating the possessors of the contraband are aware that the police are on their trail; and

(5)    The ready destructibility of the contraband and the knowledge that the efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

United States v. Gomez-Moreno, 479 F.3d 350, 354-355 (5th Cir. 2007); United States v. Bailey, 2007 WL 2751314 (5th Cir. 2007).

The evidence shows that the officers had probable cause to (1) arrest Hearn as he exited Room 1711 and (2) believe there was contraband inside Room 1711.  Probable cause existed based on the detailed information from the CI, who was known to the officers and had been reliable in the past.  The CI identified Hearn as her source, and the CI said that she saw about a pound of methamphetamine inside Room 1711.  The officers also had electronically monitored the controlled purchase by the CI from Hearn in Room 1711.

The officers also had exigent circumstances to enter Room 1711 to prevent the destruction of evidence and for officer safety.  The CI had reported to officers that there was a large quantity of methamphetamine in a Wal-Mart shopping bag inside Room 1711.  At the time of Hearn's arrest, the officers believed that another person (who was later identified to be Blanton) was still inside the room with the drugs.  Vol. I, p. 95.  Due to the large quantity of drugs in the room, the officers reasonably feared that guns might also be present.  Vol. I, pp. 84, 130-131.  If Hearn did not return promptly from his visit to the vending machine, as Blanton probably expected him to do, it is possible that Blanton would have destroyed the contraband.  Thus, exigent circumstances existed which justified the officers' entry into

Room 1711 to secure the room prior to the search warrant. A full search of Room 1711 was not conducted until the search warrant was signed.

Hearn also argues in his motion to suppress that all of his statements made following the search of Room 1711 should be suppressed. However, the evidence shows that (1) Hearn was, upon his arrest, immediately advised of his rights and (2) the statements he gave to the officers were voluntarily made. There is no evidence of a lengthy detention or any coercive or improper procedures used by the officers. Considering the totality of the circumstances, the Government has satisfied its burden of showing by a preponderance of the evidence that Hearn voluntarily waived his rights and that Hearn's post-<u>Miranda</u> statements were freely and voluntarily made. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). <u>United States v. Barlow</u>, 41 F.3d 935 (5th Cir. 1994); <u>United States v. Mullin</u>, 178 F.3d 334, 341 (5th Cir. 1999).

### Collins' Motion to Suppress (Doc. 30)

Cassandra Collins, who was arrested near the DiamondJack's casino lobby after leaving Room 940, argues that her Motion to Suppress should be granted because:

>    (1)    The interception of private conversations of the occupants of Room 940 was an unlawful search and seizure;

>    (2)    Collins' arrest was unsupported by reasonable suspicion or probable cause;

>    (3)    Collins' post-arrest statements were taken in violation of her right against self-incrimination and her right to assistance of counsel; and

(4)    Collins' consent to search her car was not voluntarily given.

**Eavesdropping on Room 940**

Collins argues that Agent Green violated the Fourth Amendment when he opened Room 941's interconnecting door and eavesdropped on the occupants of Room 940 by pressing his ear against the door, listening through the door, and lying on the floor with his ear at the crack under the door.  According to Collins, if this search and seizure is allowed, then no private conversations can ever be had in a hotel room, and the most intimate conversations may as well occur in the hotel lobby.  Collins' Supplemental Memorandum at p. 9.

Collins' arguments are unpersuasive.  As an initial matter, Collins has no standing to complain about the officers' monitoring of Room 940.  Room 940 was not Collins' room.  Collins was only inside the room for a matter of minutes.  She was not the registered guest, nor was she an overnight guest in that room.  Accordingly, Collins had no expectation of privacy inside Room 940.  See United States v. Wineinger, 208 Fed. Appx. 286, 289 (5th Cir. 2006) (not merely any temporary visitor, but only overnight social guests, may under certain circumstances be entitled to Fourth Amendment standing to challenge a search when present in another person's home); United States v. Irizarry, 673 F.2d 554, 556-557 (1st Cir. 1982) (defendant offered no evidence of any personal interest in the room beyond being merely present; room was registered to someone else).

Even if Collins had standing to challenge the eavesdropping on the occupants of Room 940, the officers' actions in this case did not violate the Fourth Amendment. The agents did not use any electronic or other equipment in attempting to overhear the conversations in Room 940. Instead, Agent Green listened through and under the door with his "naked ear." In United States v. Jackson, 588 F.2d 1046 (5th Cir. 1979), the Fifth Circuit found no justifiable expectations of privacy with respect to motel room conversations which were audible to the unaided ears of government agents lawfully occupying an adjoining room. Collins' attempts to distinguish Jackson on the ground that, in this case, Agent Green opened Room 941's interconnecting door and placed his ear against (and under the crack of) the closed interconnecting door of Room 940. However, Collins cites no authority to support her argument that Agent Green's actions were improper. Agent Green was lawfully inside Room 941, and he was well within his right (just as any other occupant of Room 941 would be) to open Room 941's portion of the adjoining door between the two rooms. See United States v. Agapito, 620 F.2d 324, 329-330 (2d Cir. 1980) (agents did not violate the Fourth Amendment when they pressed their ears against a connecting door between hotel rooms in order to overhear conversations).

**Collins' Arrest**

Collins argues that her detention and arrest were unsupported by reasonable suspicion or probable cause. She contends that the officers lacked any particularized information that there was presently any contraband in Room 940, the room which Collins occupied before

she was arrested.  She further argues that the officers had no information connecting her to the drug transactions in Room 930 that ultimately led officers to monitor Room 940.  Finally, Collins argues that there was no information indicating that she was in possession of any contraband at the time she was seized.

Collins' arguments have no merit.  The officers arrested Collins based on probable cause that she possessed methamphetamine.  Collins was observed leaving the room registered to an individual known to be distributing drugs.  And while Collins was in Room 940, the officers overheard statements about drug dealing.  The totality of the circumstances satisfies the undersigned that the officers had probable cause to detain and arrest Collins.

**Collins' Statements**

Four undercover officers approached Collins as she walked through the lobby of DiamondJack's Casino.  The officers escorted Collins into the parking garage where she was advised of her <u>Miranda</u> rights and then questioned.  Collins told Agent Haynes that seven ounces of methamphetamine were in her purse.  She also stated that a small amount of drugs were located in her car.

Despite Collins' arguments to the contrary, the evidence shows that Collins' statements were freely and voluntarily made.  No coercive or improper police procedures were used, and Collins was properly advised of her <u>Miranda</u> rights before she made the incriminating statements.  Moving her from the hotel lobby to the parking garage area was not done to intimidate her but simply to avoid creating a scene in the public area of the casino

lobby.  Vol. I, p. 197.   The totality of the circumstances show that Collins freely and voluntarily waived her rights and made the incriminating statements.

**Search of Collins' Car**

Collins argues that her consent to search her car was not voluntarily given and, therefore, the marijuana, methamphetamine pipe, marijuana pipe and digital scales seized from her car must be suppressed.

The Fifth Circuit considers six factors in evaluating the voluntariness of consent to a search:

(1)    The voluntariness of defendant's custodial status;

(2)    The presence of coercive police procedures;

(3)    The extent and level of the defendant's cooperation;

(4)    The defendant's awareness of his right to refuse consent;

(5)    The defendant's education and intelligence; and

(6)    The defendant's belief that no incriminating evidence will be found.

United States v. Freeman, 482 F.3d 829, 832 (5th Cir. 2007); United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993).  No one factor is determinative, and consent is determined from the totality of all of the circumstances.  Kelly, 981 F.2d at 1470.

As explained above, Collins was properly advised of her Miranda rights, and no improper or coercive police tactics were used.  Collins was very cooperative with the

officers. Considering the totality of the circumstances, Collins' consent to search her car was freely and voluntarily given.

### Nichols' Motion to Suppress (Doc. 42)

Selena Nichols' original Motion to Suppress made numerous arguments attacking the application for the search warrants, the timing of the execution of the warrants, and the interception of her private conversations. None of these arguments has any merit. In fact, the only argument actually pressed by Nichols in her supplemental brief is that she was denied her right to counsel during her interrogation.

Once an accused has invoked her right to counsel, her responses to further police questioning are admissible only after a finding that she (1) initiated further discussions with the police, and (2) knowingly and intelligently waived the right she had invoked. Edwards v. Arizona, 469 U.S. 91 (1984); United States v. Juarez-Perez, 213 Fed. Appx. 273 (5th Cir. 2007).

It is not disputed that, after Nichols was arrested outside of Room 923 and brought back to Room 940, she exercised her right to counsel. Once that right was invoked, Nichols was not questioned further. Nichols and Tomlinson did initiate further discussions with the officers when they asked the officers how much jail time they were facing. The officers advised Nichols and Tomlinson how much time they were facing (which is not a form of interrogation), at which time both Defendants indicated that they wanted to cooperate. The evidence showed that both Nichols and Tomlinson were again advised of their rights under

Miranda before they made any further statements. Considering the totality of the circumstances, the waiver of rights and subsequent statements made by Nichols and Tomlinson were knowing, voluntary and intelligent.

### Hammond's Motion to Suppress (Doc. 36)

Joel Hammond's Motion to Suppress argues that the officers lacked probable cause for his arrest; that his post-arrest statements were not voluntary or an independent act of free will; that neither he nor his wife gave consent to search Room 923; and that the search of Room 923 was unreasonable because there was no search warrant and no exigent circumstances.

**Hammond's Arrest**

The officers had probable cause for the warrantless arrest of Hammond outside Room 923. Earlier in the evening, Hammond was seen entering Room 940, which was the room identified by Blanton as occupied by "Lora" and the source of his methamphetamine. Less than an hour after Hammond left Room 940, the agents overheard Tomlinson and Nichols inside Room 940 discussing drug dealing. Agents also overheard the use of a butane lighter, which is often used to smoke methamphetamine. When Tomlinson and Nichols left Room 940 at approximately 11:13 p.m., Nichols went to the lobby of the hotel to meet Hammond. By this time, probable cause for the search of Room 940 had been established, and the search warrant for that room had been signed at approximately 10:58 p.m. Hammond's visit to the room earlier that evening, and his subsequent meeting with Nichols later that evening,

together with the other evidence of drug dealing in Room 940, gave the officers probable cause to believe that Hammond was involved in the distribution of drugs with Tomlinson and Nichols.

**Entry and Search of Room 923**

Hammond contends that the officers' entry and search of Room 923 were nonconsensual.  There is testimony that Mrs. Hammond opened the door to Room 923 to investigate the commotion occurring in the hallway outside of the door (where Mr. Hammond and Ms. Nichols were being arrested) and that Agent Hank Haynes asked Mrs. Hammond for permission to enter the room.  Sargent Townley testified that Ms. Hammond then attempted to close the door, but the officers pushed on the door and walked into the room.  Vol. I, pp. 48, 50.  On the other hand, Agent Haynes testified Mrs. Hammond stated that she needed to put some clothes on, which Agent Haynes interpreted as consent for the officers to enter the room immediately.  Vol. I, pp. 201, 223-225 and 242.

The Court need not resolve the conflict in the testimony of the Government's witnesses.  The facts show that, when the officers made the arrest of Hammond and Nichols in the hallway right outside of Room 923, Mrs. Hammond opened the door to Room 923 to see what was going on.  Both Hammond and Nichols had been tied to Lora Tomlinson and the sale (or purchase) of methamphetamine from Room 940.  When Mrs. Hammond opened the door to Room 923, the officers did not know who she was (just as she did not know who they were), whether she was armed with a weapon and whether any other individuals were

located in the room. These circumstances created a dangerous situation and exigent circumstances that justified the officers' entry into Room 923 to secure the room for officer safety. Vol. I, pp. 227- 228, 242.

Once the officers followed Mrs. Hammond into Room 923, they observed a methamphetamine pipe in plain view on a table inside the room. Vol. I, pp. 201, 229-230. Agent Haynes then explained to Mrs. Hammond that they were conducting a methamphetamine investigation. Mrs. Hammond denied that any drugs were located in her room and granted the officers consent to search the room. Vol. II, pp. 305 - 309. There is no evidence of any coercion or improper police procedures. In fact, Mrs. Hammond was very cooperative. Id. at 291, 307. Thus, the initial entry into the room was justified, and once inside the room, Mrs. Hammond freely and voluntarily consented to a search of the room.

**Hammond's Statements**

Hammond argues that all statements he made after his arrest were involuntarily made and should be suppressed. Again, the evidence does not support Hammond's contentions. At the time of his arrest, Hammond was advised of his rights per Miranda. During his pat-down, Hammond told the officers that he had syringes in his socks. Vol. II, p. 290. Hammond told the officers that one of the syringes was "loaded," meaning that it had a substance in it. When the officers entered Room 923, Hammond also told the officers that his wife did not have anything to do with the drugs that were in the room, and he took credit for all of the drugs in Room 923. Vol. I, p. 243. The totality of the circumstances shows that

Hammond's waiver of his <u>Miranda</u> rights and his post-waiver statements were freely and voluntarily made.

### Tomlinson's Motion to Suppress (Doc. 33)

Lora Tomlinson makes several arguments in support of her motion to suppress: the entry and search of Room 1711 were illegal; the eavesdropping on the conversations in Room 940 was improper; the search of Room 940 was not supported by probable cause; the warrant for Room 940 did not comply with Rule 41; and the officers' continued questioning after she invoked her right to counsel violated her Fifth and Sixth Amendment rights.

**Room 1711**

Tomlinson lacks standing to complain about the search of Room 1711.  The room was not registered to her, and there is no evidence that she ever entered Room 1711.  There is no evidence that Tomlinson had any interest whatsoever in Room 1711.  <u>See</u> <u>Wineinger</u>, 208 Fed. Appx. at 289 and <u>Irizarry</u>, 673 F.2d at 556.  However, even if she had standing, the evidence shows  that exigent circumstances justified the officers' entry into Room 1711.  <u>See</u> discussion of Hearn's motion to suppress, <u>supra</u>.

**Eavesdropping on Room 940**

Tomlinson argues that the evidence gathered from listening through or under the door adjoining Rooms 940 and 941 should be suppressed.  For the reasons set forth above in the discussion of Collins' motion to suppress, this argument has no merit.  <u>See</u> <u>Jackson</u>, 588 F.2d at 1046 and <u>Agapito</u>, 620 F.2d at 329.  Any occupant of Room 941, including a DEA agent,

had the right to open his or her half of the adjoining door. Opening that door is not, as Tomlison argues, the equivalent of removing the sheet rock or paneling between the rooms. Tomlinson's Supplemental Brief, p. 21. The agents' opening of their half of the adjoining door and then listening with their "naked ear" through or under the remaining part of the door did not constitute a Fourth Amendment search or otherwise violate Tomlinson's constitutional rights.

**Probable Cause to Search 940**

Tomlinson attacks the probable cause for the warrant for Room 940 on three primary fronts: statements taken from Blanton and included in the warrant application (paragraph 4) were false and cannot be relied on for probable cause; evidence overheard by eavesdropping on Room 941 should not have been included in the application (paragraph 5); and references in the application (paragraph 6) to Collins' possession of seven ounces of methamphetamine do not support probable cause to search Room 940 because there is no indication that Collins purchased the drugs from anyone inside Room 940.

None of these arguments has merit. The key information provided by Blanton was corroborated: he purchased methamphetamine from a person named "Lora" in Room 930. The casino's management then confirmed the presence of Lora Tomlinson in Room 940 (and that she had moved from Room 930 earlier that day). Agents then overheard (without the aid of any listening devices) discussions regarding drug dealing in Room 940. Collins then entered the room for a short time and, when confronted after she left the room, she had seven

ounces of methamphetamine in her purse.  There was not airtight proof that Collins bought the drugs in Room 940, but that is not required.  The facts were sufficient to cause a reasonable person to suspect the drugs came from Room 940.  All of this information, considered together, provided probable cause to issue a warrant to search Room 940.  The fact that Blanton may have provided other, uncorroborated information does not mean it was improper for the officers to include Blanton's corroborated information in the warrant application.

**Rule 41**

Defendant argues that the warrant for Room 940 did not comply with Rule 41 because the warrant does not authorize a night time search.  However, the warrant application was presented to the undersigned at 10:58 p.m. on March 9, 2007.  The warrant required that it be executed on March 9, 2007, thus necessitating that it be executed during the remaining 62 minutes of March 9.  By executing the warrant under those circumstances, the undersigned necessarily found good cause for the night time search.

Defendant argues that the search of Room 940 was invalid because the return only gives an approximate time (11:20 p.m.) of the search.  However, the evidence shows that the warrant was executed at about the same time it was signed.  (Agent Sears, who presented the warrant application along with Agent Herrin, telephoned the other agents to notify them that the warrant had been signed and that the search had to be done by midnight.)  Vol. 3, pp. 358-360.  Even if the time shown on the return is off by a few minutes, Tomlinson has shown

no bad faith or intentional non-compliance with Rule 41.  She also has demonstrated no prejudice.  United States v. Neal, 182 Fed. Appx. 366, 371 (5th Cir. 2006)("[V]iolations of Rule 41 are ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith.").

Next, Defendant argues that the officers violated Rule 41 when they omitted, from the search warrant return, Exhibit 6 (500 grams of methamphetamine discovered in Room 940). Tomlinson faults the agents for not making an amended return when they discovered the error.  This, too, is simply a ministerial error that does not invalidate the warrant or the search.  Furthermore, the undersigned's office was contacted (by an agent) about doing an amended return to correct the omission, but the undersigned refused that request because a motion to suppress was already pending.  The omission of Exhibit 6 was not intentional or in bad faith, and the existence of Exhibit 6 was well known to Defendants and their counsel. The error caused no prejudice and does not justify the suppression of any evidence.

**Tomlinson's Statements**

Lora Tomlinson and Selena Nichols initially invoked their right to counsel when the agents returned them to Room 940.  At that point, questioning ceased.  It was not until Tomlinson and Nichols initiated further discussions with the agents about how much jail time they were facing that they stated they wanted to cooperate and were questioned further.  And before they were questioned further, both were advised (again) of the Miranda rights.

In the discussion of Nichols' motion to suppress, <u>supra</u>, the undersigned found that Nichols and Tomlinson initiated further discussions with the agents and then made a knowing and intelligent waiver of their previously invoked right to counsel, citing <u>Edwards v. Arizona</u> and <u>United States v. Juarez-Perez</u>.  The same result holds true with regard to Tomlinson's motion.  The agents respected Nichols and Tomlinson's invocation of their right to counsel.  It was Nichols and Tomlinson, not the agents, who initiated further discussions with the agents.  After being advised of their rights a second time, both made a knowing and intelligent waiver of their rights and voluntarily made incriminating statements.

**Conclusion**

Defendants' motions to suppress should be denied.  The evidence shows the officers and agents acted reasonably and in good faith in conducting the searches and seizures involved in this case. Multiple law enforcement agencies were involved in a quickly evolving and complex methamphetamine investigation that, within a very short time frame, led them to three different rooms at two different hotels and six defendants.  Some ministerial mistakes were made with respect to the warrant returns, but the evidence shows that no constitutional rights of any defendant were violated.

Accordingly;

**IT IS RECOMMENDED** that Defendants' **Motions to Suppress** [Docs. 30 (Collins), 32 (Hearn), 33 (Tomlinson), 35 (Blanton), 36 (Hammond) and 42 (Nichols)] be **denied**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **ten (10) business days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **five (5) business days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 4th day of October, 2007.


_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE